No. 12709

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

---

GLADYS L. MERRITT,

Plaintiff and Respondent,

-vs-

ARTHUR H. MERRITT,

Defendant and Appellant.

---

Appeal from: District Court of the Thirteenth Judicial District,
Honorable Charles Luedke, Judge presiding.

Counsel of Record:

For Appellant:

Jones, Olsen and Christensen, Billings, Montana
Paul G. Olsen argued, Billings, Montana
Reno and Dolve, Billings, Montana

For Respondent:

Longan and Holmstrom, Billings, Montana
Robert W. Holmstrom argued, Billings, Montana

---

Submitted: September 16, 1974

Decided: OCT 9 1974

Filed: OCT 9 1974

Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is a declaratory judgment action to have the Court declare the rights of the parties in a business known as the Merritt Distributorship. The cause was initiated by Gladys L. Merritt against Arthur H. Merritt, who counterclaimed alleging he was entitled to a one-half interest in the business and to one-half of the revenue derived therefrom. Judgment was entered in favor of Gladys L. Merritt, declaring her the sole owner of the Merritt Distributorship.

The Merritts were formerly husband and wife and for some years prior to their divorce had been engaged in the business of selling Shaklee Products as Merritt Distributors. The business was located in Billings, Montana. Shaklee Products include organic cleaners, food supplements, cosmetics, a baby line and mens toiletries that are sold by the direct selling method. Over a period of approximately nine years their distributorship had been built up to a gross annual sale of nearly $200,000. One of the keys to the success of the distributorship were the operations of 10 supervisors that had been brought into the Shaklee sales by the Merritts.

On September 9, 1970, the Merritts were divorced after reaching a property settlement agreement which was incorporated and adopted as part of the decree. The property settlement agreement provided for the division of the marital assets, including the business known as the Merritt Distributorship. Paragraph 9(f) of the Agreement recognized that the assignment of the supervisors was subject to the approval of the Shaklee Company. Paragraph 9(f) reads:

> "That during the course of the partnership,
> as set forth above, various co-ordinators,
> supervisors, wholesale and retail dealers,
> have been developed by the parties hereto;

- 2 -

that each of said co-ordinators, supervisors, wholesale and retail dealers shall have the right, subject to the approval of the Shaklee Company, to select whichever of the parties hereto he desires to act as overall co-ordinator for future distribution of Shaklee Products; that in the event that the Shaklee Company refuses to recognize the choice made by such co-ordinator, supervisor, wholesale or retail dealer for future sales, the party hereto deeming himself or herself offended thereby, shall have his or her right of action, if any, against the Shaklee Company exclusive of inter-ference from the other party."

It was known either at the time of the divorce or just after that the Shaklee Company was going to grant all of the sales force (the 10 supervisors) of the Merritt Distributorship to Gladys. An election was held which polled the 10 supervisors as to which of the parties in the partnership they desired to remain with after its dissolution. Five of them voted to remain with Gladys and the rest did not choose either so they were assign-ed to Gladys by Shaklee.

At the time of the divorce James M. Janke, C.P.A., was hired to do all books of account with the right of inspection in both parties. This was provided for in para. 11 of the Agreement and was set up along with para. 9(f) anticipating that some dis-agreements might arise between the parties relative to the inven-tory and the values of which each party was entitled to. Such a dispute did arise relative to the amount of money Gladys should pay Arthur for the property she retained. On February 24, 1971 Gladys paid Arthur the sum of $4,442.17, which she testified in her opinion represented all the assets. Arthur disagreed alleging that the words "Full satisfaction of Settlement" on the check had been scratched out while they were before the court and he alleged this was only a partial settlement. Between the time of this check, 2/24/71 and 4/1/71, Gladys became dissatisfied with her attorney and terminated their relationship. Gladys testified that on or about that date she met with Arthur, at her request, to see if a settlement could be reached. Concerning this meeting she

testified as follows:

"A.   I had no legal counsel at the time; Mr.
Merritt came to my apartment and I asked him
if he would settle for $10,000 and we'd get
this thing resolved because I was tired of
all the legal aspects and so forth, and he
thought a minute and -- I said you go to your
attorney -- he said he would go to Mr. Willis
Jones and get a paper drawn up to that effect,
and he brought it to my apartment--

"Q.   The same day?  A.   I don't recall if it was
the same or the next day.   I believe it was the
next day after the meeting of the evening.
'Cause I don't think Mr. Jones was available that
night, I'm sure.

" * * *

"Q.   And was that signed then in your apartment?
A.   Yes, it was.

"Q.   Did your husband sign it?  A.   Yes, he did.

"Q.   And did you pay the $10,000.00?  A.   I did."

The "stipulation" signed on April 2, 1971, contains the

following language:

" * * * that the parties hereby release each other
from any further liability whatsoever under said
Property Settlement Agreement * * *".

Gladys further testified her understanding of the $10,000

payment was:

"Q.   --complete settlement of all disputes for
the sum of $10,000.00.  A.   Correct.  To wipe
everything clean.

"Q.   What disputes were you having at that point?

" * * *

"A.   Well, we had been in and out of court and
I had no legal counsel at that time and in order
to resolve the whole deal, with Shaklee Corpor-
ation, myself and Mr. Merritt, I offered him, to
wipe the slate clean, for $10,000.00, with two
payments, and he agreed.  He went down to your
office and got the papers made up, 'cause I had
no legal counsel at that time.  And he did say
that he was going to have plenty from Shaklee,
anyway, from a suit which was $1,900,000.00,
later.  But he did mention that this would be
fine because he would have plenty of money,
anyway.

"Q.   Well now, you had already paid $4,442.17 to

Mr. Merritt for products and furniture, so what were you still fighting about? That is-- A. So there would be no more lawyer problems, no more court cases, 'cause I have had it. And he said that he would accept that. And I said, 'Let's just forget it,' and he said he wanted no part of Shaklee, the Shaklee business or the Shaklee distributors or promotion or anything like that, that he was going to get money. Now, that's exactly what we discussed and . . . Because -- On account of a suit against Shaklee Products for $1,900,000.00, and this was considered a complete resolving of our problems with anything to do with Shaklee between the two of us."

At about the same time as the stipulation Arthur filed a suit in federal court against the Shaklee Company alleging a breach of contract with him as to the assignment of the supervisors to Mrs. Merritt. Mrs. Merritt was not a party in the federal court case. On November 9, 1972, a consent decree issued from the federal court awarding Arthur $10,000 against the Shaklee Company and it ordered the Shaklee Company:

" * * * to make all payments, whether bonuses, commission, royalties or otherwise, currently being made to Gladys Merritt alone to Gladys Merritt and Arthur Merritt doing business as Merritt Distributors, a partnership, commencing with the date of entry of this decree, and to forthwith modify its records and accounts to show Arthur Merritt thereon with Gladys Merritt in the same style and in the same force and effect as though the said records and accounts had not been changed by defendant corporation in September, 1970 * * *."

Immediately after the consent decree came down Arthur Merritt claimed reinstatement as a partner and demanded half the income from the supervisors. This action was instituted for the purpose of determining the rights of the parties.

The issue stated by the appellant is: whether or not there is sufficient evidence for the district court to find that the stipulation of April 2, 1971, constituted a complete and full release by Arthur Merritt unto Gladys Merritt of any claim he might have had to the partnership assets.

While the respondent Gladys alleges that the issue, as

- 5 -

stated, is too narrow and argues that the "conduct of the parties" must be taken into consideration. We agree and will, for our purposes, consider the totality of the facts presented to the trial court for its decision.

In so doing we note two principles concerning the extent of appellate review many times referred to by this Court in previous cases. First, as recently set forth in Cope v. Cope, 158 Mont. 388, 392, 493 P.2d 336, the rule was stated:

> "We have many times stated that the function
> of this Court is to determine whether there
> is substantial evidence to support the find-
> ings of the trial court, and we will not
> reverse such findings of fact unless there is
> a clear preponderance of evidence against such
> findings. (Citing cases.)"

Second, as noted in Eliason v. Eliason, 151 Mont. 409, 416, 443 P.2d 884:

> " * * * The credibility of the witnesses and
> the weight to be given their testimony is a
> matter for the district court's determination
> in a non-jury case (Notti v. Clark, 133 Mont.
> 263, 322 P.2d 112; Ballenger v. Tillman, 133
> Mont. 369, 324 P.2d 1045) and the Supreme Court
> will sustain such determination by the trial
> court based on substantial conflicting evidence.
> Hammond v. Knievel, 141 Mont. 433, 378 P.2d 388;
> Havre Irrig. Co. v. Majerus, 132 Mont. 410, 318
> P.2d 1076. The trial court, having observed and
> considered the appearance of the witnesses upon
> the witness stand, their manner of testifying,
> their apparent candor or want of candor, in
> addition to the testimony itself, is in a better
> position than this Court to decide questions or
> credibility of witnesses and the weight to be
> given their testimony. * * * "

Here, the only conflict in the testimony of the parties was the intention of the parties at the time of the execution of the stipulation dated April 2, 1971. Mrs. Merritt's testimony was that she paid $10,000 to resolve all disputes growing out of the Property Settlement Agreement. Mr. Merritt's testimony was that when he accepted the $10,000, he did not give up whatever rights he had to the Shaklee Distributorship or the income from it. This argument is premised on (1) There was no consideration

- 6 -

for releasing his interest in the partnership; (2) that the consideration given was inadequate. This argument ignores the facts and certain settled principles of law.

The facts either overlooked or ignored by appellant that the assignment of the supervisors was a foregone conclusion prior to the execution of the Property Settlement Agreement of September 9, 1970, that paragraph 9(f) of that Agreement recognized that Shaklee Company controlled the assignment of the supervisors, and that the stipulation expressly released each of the parties from any further liabilities except for the payment of a promissory note.

Too, the argument of appellant ignores well settled principles of law. The Stipulation as drafted is in plain, simple and concise language. The appellant is trying to modify both the Stipulation and Property Settlement Agreement by oral testimony. We have in Montana both statutory and case law holding that oral agreements are deemed to be superseded by a written instrument.

Section 13-607, R.C.M. 1947, provides:

"The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

Section 13-705, R.C.M. 1947, sets forth the rule of interpretation of contracts:

"When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this chapter."

Two recent opinions of this Court control the disposition of this case and the appellant's argument that he did not intend to release any claim he had on the supervisors. In Heckman and Shell v. Wilson, 158 Mont. 47, 487 P.2d 1141, we held:

" * * * The rule of statute, followed mandatorily throughout the body of contract law, is that the written contract supersedes all prior negotiations and precludes evidence that alters, contradicts, or amends its written terms."

Last, the appellant seems to argue that the consent decree of the federal court adjudicated Mrs. Merritt's rights to the Merritt Distributorship.  Mr. Merritt's cause of action was against the Shaklee Company and Mrs. Merritt was never a party to the action.  Under our form of jurisprudence, such a decree could adjudicate the rights of Mrs. Merritt to the business known as Merritt Distributorship.

Here the stipulation is written in clear and unambiguous language, and the trial court after considering all of the evidence along with the exhibits properly rejected Mr. Merritt's efforts to modify the language of the stipulation by parol evidence.  There was substantial evidence to support its decision

Judgment of the trial court finding Mrs. Merritt sole owner of Merritt Distributorship is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

- 8 -